IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
JACK J. GRYNBERG and PRICASPIAN
DEVELOPMENT CORPORATION, a Texas corporation
(address for both Plaintiffs: 3600 S. Yosemite Street,
Suite 900, Denver, CO 80237),

                       Plaintiffs,

    -and-

MERCATOR CORPORATION, a New York corporation
(126 E. 56th Street, New York, NY 10022), and JAMES
H. GIFFEN, (1000 Old White Plains Road, Mamaroneck,
New York, 10543) and JOHN DOES 1-10,

                       Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## VERIFIED COMPLAINT AND JURY DEMAND

The Plaintiffs, Jack J. Grynberg and Pricaspian Development Corporation, a Texas

corporation, collectively referred to herein as "Grynberg" through their undersigned counsel and

for their Complaint against Defendants, respectfully allege as follows:

## THE PARTIES AND JURISDICTION

1.     Jack J. Grynberg is president and CEO of Pricaspian Development Corporation.

Grynberg is a citizen of the United States and resident of the State of Colorado. He is a

graduate and a trustee emeritus of the Colorado School of Mines. Grynberg has been actively

involved in oil and natural gas research, exploration, development and production for more

than fifty (50) years and is responsible for numerous oil and natural gas field discoveries and

extensions in the United States and overseas. He is a Registered Professional Engineer in good

standing in the States of Colorado, South Dakota, Oklahoma and Texas, is a member of many

professional and trade associations, author of numerous publications and holder of a U.S.

patent for the application of laser beams for the continuous detection and identification of hydrocarbons in the mud stream coming out of a bore hole while drilling. He was appointed by President Ford and reappointed by President Carter to the Committee on Nuclear and Alternate Energy of the National Academy of Sciences. He was appointed by President Clinton to participate in the presidential mission to Russia in March 1994 headed by the late Secretary of Commerce Ron Brown representing the United States oil and gas industry. He has been a speaker at the 5th, 6th and 7th United Nations sponsored conference on African Oil, Gas and Finance, where he represented the United States at the 7th conference. For the past several years he has been a speaker at oil, natural gas and biofuels international conferences in London, England, Cape Town, South Africa, Rio de Janeiro, Brazil, Houston, Texas, Lille, France, Hamburg, Germany, Bordeaux, France, and Basel, Switzerland. At all times material to this Complaint, Grynberg also has been the President and CEO of Pricaspian Development Corporation, and brings this action on behalf of Pricaspian Development Corporation and himself.

2.      Pricaspian Development Corporation is a Texas corporation that maintains its principal place of business in the City and County of Denver, State of Colorado.

3.      Mercator Corporation ("Mercator") is a New York corporation which at relevant times was under the ownership, control and management of James H. Giffen, and possibly John Does 1-10.

4.      Defendant James H. Giffen is a presently criminally-indicted, United States citizen residing in Mamaroneck, New York.

5.      This Court has appropriate jurisdiction over this action pursuant to 28 U.S.C. § 1332 and the District of Columbia's long arm statute. Venue is appropriate pursuant to 28

U.S.C. 1391(a)(2) because a substantial part of the events giving rise to these claims occurred in the District of Columbia.

## INTRODUCTION: THE GRYNBERG CONTRACTING PARTIES

6.      At all relevant times Defendants James H. Giffen and Mercator Corporation were principal liaisons between the Government of Kazakhstan and its President,  Nursultan A. Nazarbaev, as well as other high Kazakh Government officials, and the Offshore Kazakhstan International Operating Company ("OKIOC").  And on information and belief, Giffen and Mercator were principal liaisons between the Government of Kazakhstan and its President, Nursultan A. Nazarbaev, as well as other high Kazakh Government officials, and the companies comprising the Karachaganak Petroleum Operating Company ("KPO"). Plaintiffs had contractual or quasi-contractual relationships with five OKIOC companies and three KPO companies (collectively, the "Grynberg Contracting Parties"), each of which are listed in the following six (6)  paragraphs.

7.      BP PLC and BP Exploration Operating Company Limited ("BPX" and/or "BP"), incorporated under the laws of England and Wales. BP's corporate headquarters are located at 1 St. James Place, London, SW1 Y4PD, United Kingdom. BP has done, and still does business, both in and with the Republic of Kazakhstan and its Government, in the relevant time periods described below. At all times material hereto, BP was a 2/3 of 1/7th partner in the Offshore Kazakhstan International Operating Company until July, 2002, and 45% partner in LukArco, the 5% owner of the Tengiz and Korolev Oil Fields, and 12% owner of the Caspian Pipeline Company (CPC) until December, 2009.

8.      Statoil ASA ("Statoil"), formerly StatoilHydro ASA, incorporated under the laws of Norway (67% is owned by the Norwegian Government). Statoil's corporate

headquarters are located at Forusbeen 50, N-4035, Stavanger, Norway. StatoilHydro has done, and still does business, both in and with the Republic of Kazakhstan and its Government, in the relevant time periods described below. At all times material hereto, Statoil was a 1/3 of 1/7th partner in the Offshore Kazakhstan International Operating Company until July, 2002.

9.      Total S.A. ("Total" and/or "Total S.A."), incorporated under the laws of France. Total's corporate headquarters are located at 2 place de la Coupole, La Defense 6, 92400 Courbevoie, France. Total has done, and still does business, both in and with the Republics of Kazakhstan and Egypt, and their respective Governments, in the relevant time periods described below. At various times material hereto, Total S.A. was a 1/7th and later 1/6th partner in OKIOC.

10.     Royal Dutch Shell ("RDS"), incorporated under the laws of the Netherlands and has its primary address at 30 Carel van Bylandtlaan 2596 HR, the Hague, the Netherlands.  At various times material hereto, RDS was a 1/7th and later 1/6th partner in OKIOC.

11.     ENI, S.p.A. ("ENI") is a publicly-traded international energy corporation incorporated under the laws of Italy.  ENI maintains its headquarters at Piazzale Enrico Mattei 1, 00144 Rome, Italy.  ENI has, at all relevant times, maintained an interest in OKIOC and KPO.

12.     BG Group P.L.C. ("BG") is a United Kingdom Corporation with headquarters at 100 Thames Valley Park Drive, Reading, Berkshire, England.  BG has, at all relevant times, maintained an interest in OKIOC and KPO.

GENERAL ALLEGATIONS

13.     Grynberg Petroleum Company ("GPC") have been engaged in the international

petroleum industry for over forty (40) years, during which time it, along with its president, Jack J. Grynberg (collectively, "Grynberg") have developed numerous relationships with influential people in the oil, natural gas and mineral exploration, development and production industries in the former Soviet Union.

14.     In late 1989 and early 1990, GPC spent substantial time, money and energy developing proprietary, technical and confidential information regarding existing gold and petroleum fields, prospects and potential prospective areas for gold, oil and natural gas exploration, development and production in Kamchatka, Russia and Kazakhstan, the second largest (by area) republic in the former Soviet Union after Russia.

15.     Realizing that it did not possess necessary financial resources sufficient to capitalize on its proprietary and unique scientific information and its highest level contacts in Russia and Kazakhstan, GPC (heretofore referred to as "PDC") began seeking partners with access to significant capital, technology, personnel and markets. One company that expressed the earliest interest in joining PDC was BPX.

16.     In May 1990, PDC and BPX entered into an initial agreement to obtain and exploit oil and natural gas opportunities, both onshore and offshore, in Kazakhstan. Soon after execution of the May 1990 agreement BPX demanded that PDC reduce its participation in the international consortium that had been formed by PDC for Kazakh oil, natural gas and elemental sulphur exploration, development and production.

17.     On May 31, 1991, the parties executed a new agreement in which PDC's interest in the designated-area, referred to as Area of Mutual Interest ("AMI"), was reduced from 20% to 15% carried interest and BPX obtained complete control over all contacts and agreements with the Kazakhstan Consortium, on BPX's promise to obtain a 100% interest in the

Karachaganak Field through competitive bidding, which failed to materialize, without restoring the Grynbergs' 20% original carried interest as promised by BPX

18.     In 1993, before expiration of the 1991 Agreement, BPX helped form the Kazakhstancaspiishelf ("KCS") consortium, a partnership with the Kazakhstan Government. BPX's interest was split into a sub-joint venture with Statoil (2/3 BPX and 1/3 Statoil). In 1997 KCS would be redesignated as the Offshore Kazakhstan International Operating Company ("OKIOC") by which it was known until October 31, 2008, when it became known as the "new OKIOC". PDC was excluded from this Consortium following the May 1991 agreement.

19.     In 1993, BPX brought suit against PDC Texas and others in the United States District Court for the Southern District of New York, *BP Exploration Operating Co. Ltd. v. Grynberg Production Co.,* 93 Civ. 6673 (MGC), seeking a declaratory judgment to further reduce PDC's share of the net profits.

20.     The action involved, among other things, complex disputes over the proceeds from the development and production of recoverable oil and natural gas reserves located in an area commonly referred to as the Greater Kashagan Oil Field ("GKOF"). GKOF is located in the northeastern Caspian Sea in five (5) meters (16.66 feet) of water offshore the Republic of Kazakhstan, operated by the OKIOC consortium originally consisting of BPX and Statoil (jointly), Total, Shell, Mobil, ConocoPhillips, Impex of Japan, and the operator (until October 31, 2008), Agip/ENI. BPX and Statoil would ultimately sell their joint interest to Total, effective July, 2002. Mobil would ultimately be purchased (and replaced) by Exxon (now ExxonMobil).

21.     The Grynberg entities alleged that BPX had breached its fiduciary duty  by using Grynberg's proprietary, seismic,  technical, economic, confidential and unique

information, high-level contacts and other unique resources to its own exclusive advantage, while excluding the Grynberg entities from the benefits of that information and from participation in the OKIOC Consortium.

22.     After approximately three (3) years of litigation in the Federal Lawsuit in New York City in this Court, at the direction of the Honorable Miriam Goldman Cedarbaum, BPX and Grynberg agreed to arbitrate the dispute before Stephen A. Hochman as the sole Arbitrator.

23.     The Settlement agreement did not include areas outside the Greater Kashagan Oil Field, i.e., the adjacent Tengiz/Korolev Oil Fields and Caspian Petroleum Pipeline (CPC) for which separate litigation in New York has proceeded since 2006 without final resolution. A January, 2010 Arbitral Award dealing with the Greater Kashagan Oil Field is currently subject to cross motions to confirm and to vacate certain portions thereof.

24.     One outside litigation, Jack J. Grynberg et al v. ENI S.p.A., 06CIV6495 S.D.N.Y., includes a recent deposition of Richard H. Matzke, President (and later Vice-Chairman) of Chevron Overseas Petroleum, one of GKOF's early bidders, and later Vice Chairman of Chevron-Texaco.  ENI's Senior United States Executive Enzo Viscusi was also deposed.  Collectively, these depositions, each of which took place within the last few months, offer information which tends to show that Defendants acted as intermediaries between the Government of Kazakhstan and the Grynberg Contracting Parties, as well as other members of the OKIOC and KPO  consortiums.  The testimony also indicates that doing business with Giffen was mandatory for oil companies who wanted to become part of the OKIOC consortium, as well as for companies who wanted to obtain an interest in KPO and/or Karachaganak.

Giffen's Bribery Scheme and the Grynberg Contracting Parties

25.     In or about March, 2003 Giffen was arrested at Newark Airport while attempting to flee the United States. Served with a Grand Jury criminal indictment, after posting $10,000,000.00 bail, Giffen is still awaiting trial in United States District Court, Southern District of New York in U.S. v. Giffen, Case No. 03-CR-404 (WHP). Following his 2003 arrest, Giffen's defense attorneys immediately filed the following claim:

> What our government knew about Mr. Giffen's activities and what it communicated to, and internally about, Mr. Giffen is relevant to defenses going to criminal intent and will lead to other evidence relevant to those defenses. Yet the government has steadfastly refused to provide any discovery of its own records. That failure violates Mr. Giffen's rights under the Federal Rules of Criminal Procedure and the Due Process clause of the Constitution. The Court should order immediate discovery of all records held by the government relating to Mr. Giffen's activities in Kazakhstan.

*Memorandum of Law in Support of Defendant James H. Giffen's Pretrial Motions, pg. 2. March 16, 2003.*

26.     The case file has been heavily redacted with black-outs imposed by the United States under the Classified Information Procedures Act ("CIPA"), which has caused multiple delays in prosecuting the United States' case.

27.     Giffen, who had been an American oilfield supply salesman In Moscow during the Soviet period, had few qualifications and no education to provide legitimate value to either the Government of Kazakhstan or any of the oil companies who ended up doing business in Kazakhstan.  Instead, Giffen served as go-between and conduit for the large amounts of under-the-table bribes described in the Justice Department indictment.

28.     Mercator employed just two (2) clerical employees in New York and eleven (11) employees in Almaty, Kazakhstan, and four (4) in Astana, Kazakhstan, the new capital city. It served exclusively as a money laundering agent for illegal and criminal bribes to senior Kazakh officials, and for illegal and criminal kickbacks for Giffen, as well as Giffen's

unlawful evasion of United States income taxes.

29.     Describing the GKOF Consortium, the United States Justice Department's April

2, 2003 Indictment spelled out the following illegal and criminal conspiracy:

> In 1997 and 1998, a consortium of oil companies (the "Caspian
> Offshore Consortium")[…] negotiated to acquire from the Kazakh
> government the rights to participate in a joint venture known as the
> "Offshore Kazakhstan International Operating Company" ("OKIOC")
> to explore for oil in certain offshore blocks in the Kazakh sector of the
> Caspian Sea. James H. Giffen, the defendant, and Mercator were hired
> by the Kazakh government to assist in the negotiations.
>
> On or about November 18, 1997, the oil companies and Kazakhstan
> entered into a "Production Sharing Agreement" governing their
> participation in OKIOC's exploration. Under the agreement, the oil
> companies agreed to pay the Kazakh government a $175 million
> "signature bonus" due shortly after the signing of the agreement.

*Indictment of Defendant James H. Giffen, pg. 17. April 2, 2003*.

30.     The Criminal Indictment goes on to describe how this "signature bonus" was, in

fact, deliberately false and misleading nomenclature for illegal and criminal bribes to senior

Kazakh Government officials, using Mercator and various Swiss bank accounts.

31.     Giffen's role as exclusive intermediary, blocking entry of bidders unwilling to

pay a so-called "Signature Bonus," is evidenced by Mr. Matzke's recent deposition.  Mr.

Matzke describes Texaco's unsuccessful efforts to confront an unyielding Giffen and

Mercator's "intermediary" function in bidding for consortium licenses, following the

Kazakhstan Government's placing his (now known to be corrupt) enterprise in charge of entry

into each consortium.

32.     The effect of Giffen and Mercator's involvement, based on the U.S. DOJ

indictment, was to inject additional, illegal and criminal "surcharges" upon so-called expenses

deducted from the Grynberg family interests under Arbitration Agreements with BP and

Statoil, therefore tortiously interfering with those agreements.

Tortious interference with contract

33.     On or about July 17, 1990, Grynberg notified representatives of Shell that he had been assured in discussions with Kazakh President Nursultan A. Nazarbaev, U.K. Karamanov (then its Prime Minister), and Eric M. Asanbaev, leader of the Kazakhstan Congress and later Vice President) that the Republic of Kazakhstan was interested in and desirous of participating as a grantor of oil and natural gas exploration, development and production rights to, and as a partner with, a group of western oil companies to be organized by Grynberg. Shell's representatives, two of whom were Yorck H. de Heer, from The Hague, Netherlands, and P.E.R. Lovelock, from London, United Kingdom, came to Grynberg's offices in Colorado, and were presented with confidential maps, geologic, seismic, and economic data that persuaded them to enter into an agreement with Grynberg on behalf of Shell, for the joint development of the potentially gigantic and highly profitable oil and natural gas industry in the Area of Mutual Interest ("AMI") which covered the Pricaspian Sedimentiary Basin both onshore and offshore Northwest Kazakhstan.

34.     At that time, de Heer was employed by Shell Exploration B.V., and Lovelock by the SIEP (formerly SIPM), both wholly-owned Shell subsidiaries. Shell entered this agreement on essentially the same terms contained in agreements made in the same period with the other major oil companies.

35.     The agreement accepted by Shell, as with all of the other majors, established that during the exploration phase Grynberg would collect no payment but only that the exploratory, development, and production costs would be shared by each of the majors. None of the parties in this organization had the actual right to take Kazakhstan's oil – only the right

to explore and to later share in the profits from oil and natural gas production in accordance
with any subsequent agreement with the government of Kazakhstan.

36.    Each of the Grynberg Contracting Parties utilized Grynberg's highly
confidential and proprietary information and early organizing efforts to prove the true value
and extent of oil, natural gas and elemental sulphur deposits within the AMI, and then
eventually took the position that they owed Grynberg nothing.  BP, Statoil and BG entered into
watered down settlement agreements, while Total, Shell and ENI have disclaimed any
requirement to compensate Grynberg in the context of litigation.  In each case, Mr. Giffen and
Mercator have tortiously interferenced with Grynberg's right to contractual and/or economic
advantage.

37.    Giffen and his corporate "shoulder," Mercator, established themselves as
exclusive intermediaries between those desiring to participate in developing the oil, condensate
and natural gas prospects advocated by Grynberg in the Caspian Sea region, and the Kazakh
Government, which employed Giffen and Mercator to insert unconscionable and criminal
"surcharges."  Some of these surcharges were ultimately passed onto the Grynberg family.

Tortious interference with economic opportunity

38.    Juxtaposing the Giffen Indictment with information obtained more recently, it
now appears there were similar schemes in each geographic segment of the Caspian Sea region
in which Grynberg's lawful attempts to organize joint ventures, after obtaining Kazakh
Government approval and approaching possible participants, were circumvented by Giffen and
Mercator: the Karachaganak Field, the Tengiz and Korolev Oil Fields, the CPC (Caspian
Pipeline Consortium) Oil Pipeline, and, of course, the Greater Kashagan Oil Field (GKOF). In
each case, a "production sharing agreement" payment or its equivalent was employed as part of

an illegal and criminal bribery and money laundering scheme that is now being prosecuted by the United States Justice Department.

39.     It is public information that bidding for the right to develop and put on production in the Giant Karachaganak Field in June, 1992 was conducted in $50 million increments between BP and British Gas (BG), in coordination with ENI Spa. BG and ENI won with a final bid of $500 million. However, an authoritative report by the independent and internationally respected Wood MacKenzie stated on page 25 that the eventual price was not the winning bid of $500 million, but $600 million.

40.     The discrepancy was added to the winning bid, on information and belief, as a form of bribery.  In September 28, 2006, Grynberg was invited to an exclusive dinner in Washington, D.C. honoring Nursultan Abishevich Nazarbayev, the President of Kazakhstan. During the cocktail hour preceding the president's dinner, Grynberg met Mr. Enzo Viscusi, Group Senior Vice President of ENI. Mr. Viscusi was very friendly and claimed that he was just served with Grynberg's complaint against ENI, but Mr. Viscusi strongly objected that we have sued the wrong party. After dinner Mr. Viscusi and Grynberg had about a 45-minute long discussion in the hallway, at which point Mr. Viscusi admitted to Grynberg that top Kazakh government officials asked for the so-called "loan" of $100 million after the successful award of the $500 million bid in July of 1992. Agip/ENI contributed to that $100 million "loan" to top Kazakh government officials against the future bonus when the final agreement would be signed. The $100 million payment, of which $50 million was from ENI, was, on information and belief, a disguised, illegal and criminal bribe and Mr. Viscusi so indicated by winking his eye while telling Grynberg this so-called "loan" was never repaid.

41.     Further confirmation of the pervasiveness of these practices is the U.S. Justice

Department's successful prosecution of J. Bryan Williams III, a former senior executive who was in charge of Mobil's overseas crude-oil transactions in Kazakhstan. Mr. Williams was indicted and eventually convicted  on a charge of evading taxes over an alleged $2 million kickback relative to the $40 million "signing bonus" concerning Mobil's participation.

42.    Williams was ultimately convicted and served three (3) years in a federal prison for his part in the Giffen-Mercator scheme, paying a $7 million fine.

43.    Based on information recently uncovered, there was also a $20 million one-time payment by Texaco to Giffen for a 20% interest transfer from BG and ENI in the Karachaganak Field.

Giffen's public authority defense

44.    From in or about 1995, up to and including in or about July 1999, in the District of Columbia and elsewhere, Defendant Giffen, and others known and unknown, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises,  including a scheme to deprive the Plaintiffs of the full benefits of contracts and quasi-contracts related to Kazakhstan, and a scheme to defraud the Republic of Kazakhstan out of millions of dollars in taxes, unlawfully, willfully, and knowingly, caused approximately $20 million in unlawful payments to be made to Kazakh officials, and in furtherance of that scheme, on or about September 15, 1998, caused approximately $84 million to be wire transferred to an escrow account in Switzerland. This amount divides easily into sevenths (the number of OKIOC members), to compose a $12 million payment by each GKOF participant.

45.    In 2007, the U.S. Justice Department froze $84 million in Swiss bank accounts

belonging to top Kazakh Government officials. As a further indication of the seriousness of

this investigation, the May 12, 2008 Wall Street Journal reports on Dariga Nazarbayeva, the

Kazakh President's daughter's efforts to collaterally interfere with the Justice Department

decision to seal those funds.

46.     Giffen has contended in pleadings before the United States District Court in

New York that any unlawful acts were undertaken with the knowledge and support of senior

officials at United States intelligence and national security agencies. Giffen cites, for example,

the Central Intelligence Agency ("CIA"), the National Security Council ("NSA"), the

Department of State and the White House.

47.     The Justice Department has not disputed the fact that Giffen had frequent

contacts with senior intelligence officials of the United States or that he used his ties within the

Kazakh Government to assist the United States.

48.     Giffen's "public authority" defense may or may not permanently prevent a

criminal trial because the exculpatory documents he seeks from the United States Government

to defend himself are entitled to certain protections under the Classified Information

Procedures Act ("CIPA"). Upon review of the docket in the criminal case, it would appear that

Giffen's trial has been delayed in significant measure because of confidentiality issues raised

by this Act, and perhaps for other reasons as well.  The Government's case is therefore

threatened by alleged exonerating evidence permanently protected from disclosure at trial due

to national security.

49.     Whatever the implications for Giffen's criminal trial, the combined admissions

of the United States Government and Giffen with respect to actual instances of wrong-doing,

do not bar civil recovery under theories arising from common law tortious interference with

contract and business expectancy.

50.     While Government acquiescence may (or may not) prevent the criminal verdict, the Government's knowledge and approval of a third person's wrongdoing against another does not justify civil harm, or bar recovery for damages.

## FIRST CLAIM FOR RELIEF

### (Tortious Interference with Contract)

51.     The Plaintiffs hereby incorporate by reference those allegations contained in paras. 1-50 as though fully set forth herein.

52.     For the reasons stated above, Giffen and Mercator's activities tortiously interfered with Plaintiffs' contracts or quasi-contracts with each of the six (6) Grynberg Contracting Parties.  Defendants knew of Grynberg and the contracts which were involved.

53.     Plaintiffs request compensatory and punitive damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### (Tortious Interference with Economic Opportunity)

54.     The Plaintiffs hereby incorporate by reference those allegations contained in paras. 1-53 as though fully set forth herein.

55.      Giffen and Mercator knowingly built their corrupt enterprise on Grynberg's extensive and costly preparations, contacts, material outlays and exclusive intellectual property.

56.      Grynberg and Pricaspian had taken substantial steps in organizing and completing consortia in Greater Kashagan, Tengiz/Korolev and Karachaganak fields, particularly with regards to the Grynberg Contracting Parties.

57.     Plaintiffs request compensatory and punitive damages in an amount to be determined at trial.

WHEREFORE, plaintiffs claim for judgment against Defendants, jointly and severally such that each is potentially liable to plaintiffs for the entire damages award, in an amount to be determined at trial but exceeding $150,000 including exemplary damages, costs and expenses, attorney fees, judgment interest, and for such further and other relief as may be ordered by this Court.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE JURY.**

Dated: July 19, 2010

Respectfully submitted,

PRIDE LAW OFFICE

By:_____/s_____
          Kelly Pride Hebron
          1300 Merchantile Lane, Suite 139ii
          Largo, MD 20774
          (301) 583-4633

LAW OFFICE OF DANIEL L. ABRAMS, PLLC
Daniel L. Abrams (Application For Admission To Follow)
2 Penn Plaza, Suite 1500
New York, New York 10121
(212) 292-5663

Roger Jatko, Esq.
Samuel Yahn, Esq.
Grynberg Petroleum Company
3600 South Yosemite Street, Suite 900
Denver, CO 80237
Telephone: (303) 850-7490

Counsel To Plaintiffs

STATE OF COLORADO   )
                            ) ss.

COUNTY OF DENVER    )

I, JACK J. GRYNBERG, being first duly sworn, state under oath that I am the individual plaintiff and the Chief Executive Officer of the Plaintiff Pricaspian Development Corporation, that I have read the foregoing VERIFIED COMPLAINT AND JURY DEMAND, and that the statements contained therein are true and correct except where stated on information and belief.

Subscribed and sworn to before me this 19th day of July, 2010 by Jack J. Grynberg.

Notary Public

My commission expires:  May 13, 2014